WHITNEY *against* THE FIRST ECCLESIASTICAL SOCIETY IN BROOKLYN.

Where an ecclesiastical society, in 1755, voted to *call* the plaintiff, who was then a preacher of the gospel, and a candidate for settlement, to *settle* with them in the work of the gospel ministry, and to pay him the sum of 65*l.* annually as a salary, and the sum of 300*l.* as a settlement, payable in three annual instalments; the plaintiff accepted the call, and agreed to settle with such society, on the terms proposed; and in *February*, 1756, he was duly ordained and set apart to the work of the gospel ministry, as pastor of such society, and of the church therein; it was held, that the pastoral office, with which the plaintiff

*Windham,*
July,
1824.

*Whitney*
*v.*
Brooklyn.

thus became vested, was an office, not determinable at the will of either party, but for the life of the incumbent.

What acts or omissions of the incumbent create a forfeiture of the pastoral office, and thereby incapacitate him for the performance of pastoral duties, is a question not within the province of a court of law to determine, it being exclusively within the cognizance of an ecclesiastical tribunal.

Where it appeared, in an action brought by the minister against the society, for his salary from the 4th of *February,* 1821, to the 4th of *February,* 1822, that the society, on the 23rd of *April,* 1821, requested him to ask of them a dismission from his pastoral office ; it was held, that this was an explicit recognition of the plaintiff as the minister of the society, at that time, and a waiver of all claims of forfeiture for previous acts or omissions.

Where it appeared, in such action, that the plaintiff, after the 2nd of *November,* 1820, did not preach in the society, or perform any pastoral duty in their meeting-house, though he repeatedly administered the sacrament to certain persons who had certificated from the society, in common with other members of the church, at his own house ; but it also appeared, that on the 2nd of *November,* 1820, the society passed a vote, prohibiting the plaintiff from going into their meeting-house to perform any pastoral duty, and appointed a committee to prevent his entrance, who, on his attempting to enter, the next succeeding *Sunday,* to administer the sacrament to the church, shut him out ; it was held, that the plaintiff was not precluded from a recovery, for non-performance of pastoral duty, his offer to perform, in connexion with the acts of the society, being equivalent to actual performance.

Where the plaintiff has made out a case, which, if unanswered, entitles him to recover ; and the facts claimed by the defendant, constitute no legal defence ; it is the duty of the judge to direct the jury to return a verdict for the plaintiff.

This was an action of *assumpsit,* brought by the Rev. *Josiah Whitney,* D. D., to recover his salary as a minister of the gospel, for the year ending the 4th of *February,* 1822.

The cause was tried at *Brooklyn, September* term, 1823, before *Peters,* J.

At a meeting of the society, duly warned and held, on the 17th of *November,* 1755, the society voted to call the plaintiff, who then was a preacher of the gospel, and a candidate for settlement, to settle with them in the work of the gospel ministry, and to pay him the sum of sixty-five pounds, lawful money, annually, as a salary, and the sum of three hundred pounds, as a settlement, payable in three annual instalments. At the same meeting, a committee of the society were appointed to communicate this vote to the plaintiff ; which was immediately done. On the 7th of *January,* 1756, the plaintiff communicated his answer in writing to the society, accepting of the call, and agreeing to settle with the defendants, on the terms proposed.— At a legal meeting, held on the same day, the society voted to accept of the plaintiff's answer. On the 4th of *February,* 1756, the plaintiff was, accordingly, duly ordained and set apart to the

work of the gospel ministry, as pastor of the society, and of the church therein. He continued in that capacity, and discharged all the duties incumbent upon him, until the year 1818 ; and during this period, and until the 4th of *February*, 1821, the society paid him his salary from year to year, as it became due. In the years 1818 and 1819, and down to the 2nd of *November*, 1820, the plaintiff, at times, when his health would permit, preached to the society, and discharged all other pastoral duties, except that in the two former years he did not administer the sacrament of the Lord's supper to the church ; but it did not appear, that he was ever requested to do this, or that the society, or any member thereof, made any objection on that account.

At a legal meeting, on the 2nd of *November*, 1820, the society appointed a committee to wait on the plaintiff, and request him to agree to relinquish preaching in their meeting-house, on condition that they would secure to him his salary for life. At a meeting on the 23d of *April*, 1821, the society passed another vote, appointing a committee to wait on the plaintiff, and request him to ask of the society a dismission from his pastoral office. This vote was communicated to him in writing, on the 9th of *May*, 1821 ; to which he dissented.

In the year 1820, from *May* until *October*, the plaintiff administered the sacrament of the Lord's supper to the church in said society, in the meeting-house of the defendants, and admitted to the communion members of the church, who had certificated from the society ; no member of the society having made any objection thereto.

After the 2nd of *November*, 1820, the plaintiff did not preach in the society, or perform any clerical duty in their meeting-house ; but the society, on that day, passed a vote, prohibiting the plaintiff from going into their meeting-house to preach or pray, or to attend any meeting whatever, except freeman's, society, church and singing meetings ; and on his attempting to enter the meeting-house, the next succeeding *Sunday*, to administer the sacrament to the church in said society, he was shut out, by the committee of the society appointed to prevent his entrance.

After the 2nd of *November*, 1820, the plaintiff repeatedly administered the sacrament to certain persons, who had been members of said society, and of the church therein, and had certificated therefrom, in common with other members of the church, at his own house ; notice of communion having been

*Windham,*
July
1824.

Whitney
*v.*
Brooklyn.

given at the place where such certificated members held their meeting, and not in the meeting-house of said society.

The defendants claimed, That the legal construction of the original contract of settlement was such, that either party had a right to dissolve it, at any time ; and that the vote of the 2nd of *November*, 1820, was notice to the plaintiff of their intention to dissolve it : That if this construction were not correct, it was a contract but from year to year ; and if not renewed by the parties, ceased, at the end of each year : That the mere omission of the plaintiff to administer the sacrament during the years 1818 and 1819, was such a neglect of duty as forfeited his office of pastor, and his right to recover in this action : That his admitting to the communion, in 1820, members of the church, who had certificated from the society, was a forfeiture of his office, and of his right to recover : That his administering the sacrament to certificated members of the church and society, at his own house, subsequent to the 2nd of *November*, 1820, in the manner stated, was an abandonment of his office, and of his right to recover.

The judge instructed the jury, that the call and settlement of the plaintiff, constituted a contract, which could not be dissolved at the will of either party. He then submitted the cause as follows : " If you find, that previous to the 4th of *February*, 1821, and during the year then ensuing, the plaintiff voluntarily abdicated the office of minister in said society, and neglected and refused to perform the duties of his office, your verdict will be for the defendants ; otherwise, for the plaintiff, to recover the amount of his salary due and unpaid, on the 4th of *February*, 1822, with interest."

The jury returned a verdict for the defendants ; and the plaintiff moved for a new trial, for a misdirection.

*Goddard* and *Cleaveland*, in support of the motion, contended, That upon the undisputed facts in the case, the plaintiff was entitled to recover ; and the judge ought to have directed the jury to return a verdict in his favour. The plaintiff had made out his case, having proved the contract, the performance of the stipulated services,—or, what is equivalent, an offer to perform, and a prohibition by the defendants,—and a breach on the part of the defendants. What could he do more ? What was there to be left to the jury ?

The counsel then proceeded to examine the several claims, set up by the defendants, by way of defence.

1. Was the contract of settlement dissoluble at the will of either party ? First, there is nothing in the *terms* of it, from which such an inference can be made. On the contrary, *to settle* is to become *permanently fixed.* Secondly, the *nature* of the contract furnishes no such inference. The settlement of a minister constitutes an interesting and important relation ; it is attended with the most impressive religious solemnities ; and the salary, and the additional sum of money under the name of settlement, are fixed with reference to a continuance of the relation through life. Could the plaintiff, as soon as he had received his three hundred pounds settlement, put an end to the contract, and leave his people ? Thirdly, the *usage* of the country, at the time this contract was entered into, furnishes no such inference. Ministers were then invariably settled for life. Fourthly, the *laws*, in view of which the parties entered into this contract, regarded the settlement of a minister, as forming a permanent relation. *Stat.* 165. & *seq* ed. 1750. Fifthly, the contract was not dissoluble, in 1820, at the will of the defendants, because the plaintiff could not then be put in *statu quo.* *Hunt* v *Silk,* 5 *East* 449. He had spent sixty-five years in their service ; and was too far advanced to seek his bread among strangers.

2. If the defendants had the option of rescinding the contract, did they rescind it, before the 4th of *February,* 1821 ? First, there was no vote of the society dissolving the connexion. There was only a *request*, that the plaintiff would ask a dismission ; which he declined doing. Secondly, this request was not made until the 23rd of *April,* 1821, more than two months after the commencement of the year mentioned in the declaration ; and it was not communicated to the plaintiff, until the 9th of *May,* 1821. Thirdly, the vote of the 23rd of *April,* 1821, not only did not dissolve the relation, and put an end to the contract, but it recognized the subsistence of both, at that time.

3. Was this a contract from year to year only ? All the considerations opposed to its being dissoluble at the option of either party, are equally opposed to this construction. The claim is even more novel and absurd.

4. Was the omission of the plaintiff, in the years 1818 and 1819, to administer the sacrament, a forfeiture of his office, and of his rights under the contract ? In the first place, it does not appear, that the plaintiff was *requested* to administer the sacrament within that period. Secondly, it does not appear that such a state of things existed, as to render it *convenient* or *proper*

for him to administer the sacrament.    Thirdly, it belonged to him, by virtue of his pastoral office, *to judge* how frequently, and when, it was proper to administer the sacrament.    This Court will presume, that he exercised his discretion soundly. Fourthly, if he was chargeable with a neglect of duty, in this respect, it would not follow, that the relation between him and his people was thereby *dissolved.*   He might still render important services to the church and society, by his instruction, his advice, his example.   The very presence of such a man in the society, spreads through it a moral influence of incalculable value.   Fifthly, non-user, if complete, does not, at common law, make an office void, but only renders it *voidable, on process.*

5. Did the plaintiff's permitting certain certificated members of the church to come to the communion, create a forfeiture of his office ?   If so, then every minister, who, in conformity with the general practice, permits the members, in regular standing of a sister church, to commune with his own church, forfeits his pastoral office.

6. Did the plaintiff's administering the ordinance at his own house, and not at the meeting-house, subsequent to the 2nd of *November,* 1820, amount to an abandonment of his office ?— Where else should he discharge this part of his pastoral duty ? The defendants had shut him out of the meeting-house.

If the contract of settlement was for the life of the plaintiff, and none of these acts or omissions put an end to that contract, or dissolved the relation between the plaintiff and the defendants ; then there was no defence to the action, and the judge ought to have directed the jury to return a verdict for the plaintiff, for the amount of the salary demanded.

*Frost,* contra, remarked, that as the charge given by the judge, was not conformable to the claims or wishes of the defendants, he should not deem it incumbent on him to support it. He was satisfied with the result.   The jury have found, that the plaintiff had voluntarily abdicated his pastoral office in the society, and neglected and refused to perform its duties.   Has the plaintiff made out such a case, that notwithstanding this, he is entitled to a verdict in his favour ?

1. What is the true construction of the contract of settlement ?   The *terms* of that contract do not import a contract *for life.*   If it is so, it is by reason of the subject matter, and the character and relative situation of the parties.   There is

nothing so peculiar in these circumstances, as to affect the construction of the contract. The subject matter is the professional services of the plaintiff. The defendants wanted the benefit of them. The plaintiff wanted pay for them. The defendants requested him to render them, and offered to pay him sixty-five pounds a year. Now, it is clear, in the first place, that the defendants agreed to pay, only in consideration of services to be rendered. From the nature of the case, the obligation to pay could last no longer than the continuance of the services. Secondly, as the compensation was made *by the year*, the contract ceased at the end of the year, unless renewed by the parties, either tacitly or expressly. Thirdly, if it were otherwise, still as no time was specified for the duration of the contract, each party had the right of putting an end to it, at pleasure.

2. Admitting that the plaintiff, by virtue of the contract of settlement, became entitled *prima facie* to his salary for life, might he not forfeit that right, by an utter neglect and refusal to perform the duties of his office? This will hardly be denied.

3. The only remaining question, then, is, whether there was evidence before the jury, on which the judge could submit to them the fact of the plaintiff's having abandoned his office.— And here it is not necessary or proper to determine the *weight* of the evidence. The motion is not adapted to this purpose. The mover does not ask for a new trial, because the verdict was against the weight of evidence; and therefore, the motion does not profess to state *all* the evidence in the case. If there was *any* evidence conducing to prove an abandonment, by the plaintiff, of his office, it was proper for the judge to submit the fact, upon that evidence, to the jury. Now, it appears from the motion, that during the years 1818 and 1819, the plaintiff neglected to administer the sacrament of the Lord's supper to the church, without any excuse for such neglect, except that he was not requested to perform this duty. A special request was clearly unnecessary. The plaintiff was bound to perform all his pastoral duties spontaneously. Further, the plaintiff not only neglected his duty to the members of his own church, at one period, but at another, he admitted to the privileges of that church persons who had certificated from the society. And finally, he gathered about him, at his own house, a new church, composed wholly of persons certificated from the society, to whom, instead of the people of his charge, under the contract of settlement, he brake the bread of life. Surely, this neglect

towards his own flock, and this care of another fold, *conduced to prove* an abandonment of the pastoral office ; and if so, that question of fact was properly submitted to the jury, and their verdict ought not to be disturbed.

HOSMER, Ch. J.   Three questions are raised, in this case, for determination.   First, was the contract between Doctor *Whitney* and the parish at *Brooklyn* such, that he held his office at the will of the latter ; or was it an office for life, determinable on sufficient cause, exhibited and proved before a proper tribunal ?   Secondly, has Doct. *Whitney*, by any act or omission of his, forfeited his office, and lost the capacity of performing ministerial services ?   And lastly, has he actually omitted the performance of his official duties ; and thus failed in entitling himself to the salary demanded ?

If a construction of the contract is to be made from a part of the words of it only, there seems to be some ground for the supposition, that Doct. *Whitney* held his office at the will of the parish.   No fixed period of service was agreed on ; and in some cases, this indefiniteness would render a contract determinable at the will of either party.   If the contract was terminable at the will of one party, it necessarily was equally terminable at the will of the other ; as this is the law of estates at will.   An agreement is not always construed by the expressions of it, abstractly considered ; but the subject matter, the law and usage, in such cases, and the consequences of the construction, are all taken into view, to ascertain the intention of the parties.   Once fix the intention, and you have an infallible criterion of the agreement, or, more properly, you have the agreement itself.— When the contract was made, there was in existence, an act for the settlement and support and encouragement of ministers, prescribing, that the person *called* and *settled*, should be the minister of the society ; that the agreement made with him should be observed, according to its true intent and *purposes ;* and that the society should *take care*, annually, to grant and levy a tax for his support.   Under this law Doct. *Whitney* was *called* and *settled*, in the usual manner ; a *salary of sixty-five pounds yearly*, was agreed to be given him ; and a settlement of *three hundred pounds*, to be paid *one third in one year, one third in two years, and one third in three years ;* and by ordination, he was placed over the parish, and their spiritual interests were thus solemnly committed to his charge.   When it is considered, that the society agreed to settle, and, by proper author-

ity, procured Doct. *Whitney to be settled*, no person can believe, that he held his office at will. The word *settled*, has, from the frequency of its application, and universal understanding, the precision of a technical term, and undoubtedly means, to place a person in a permanent seat, or to fix him in a stable course of life. But an office held at will is no *settlement*; it has neither permanency nor stability.

That a *yearly* salary should be given to an officer, whose brief existence might be a month only, and who had no legal certainty of holding his office for any determinate period; that there should be conferred on him a *settlement* of three hundred pounds, immediately after the reception of which, he might terminate his relation to the parish, and pocket the money; that this settlement should be made payable by three annual instalments, when his official existence, the society or the minister might annul in a day; are a complication of absurdities, that no reasonable mind can admit. As little reconcilable is the supposition of a contract at will, made by the society, with the law of the state, and the solemn transactions of the ordination. By law, every parish was authorised to *call and settle* a minister; and *Brooklyn*, in view of this law, did call and settle Doct. *Whitney*. That the legislature intended to encourage and provide for the support of an able, faithful and permanent ministry, by the provisions of the act alluded to, is as certain as that they had at heart the religious, moral and even political interests of the community; and that the contract was made by the parish of *Brooklyn*, with the same wise and honest intention, there is no reason to doubt. I cannot ascribe to a respectable society the unparallelled absurdity of first agreeing to support a minister for no determinate duration, and then as a sanction to an agreement terminable by caprice, at pleasure and without a single reason, save inclination, assembling a convocation of divines, by a religious solemnity, to give importance to a transaction of no assured permanency.

The subject matter of the contract leaves no doubt as to the intention of the parties. A minister ought to be acquainted with the people of his charge, that from a knowledge of their circumstances, habits and characters, he may adapt his instructions to their profit. His duty it is to reprove vice, to discountenance folly, and to stem the torrent of corruption, wherever it appears; and when, by a life of exemplary piety and diligence, he is borne down by sickness, or the infirmities of age, it is fit and desirable, that he should have his way smoothed by

kind offices, and a competent support, and not be dismissed to poverty and neglect. All this, regard being had to the words of the contract, the law of the state, the practice of the community, and the object of the settlement, was unquestionably within the intention of the parties To accomplish these purposes, it was indispensible, that there should be a legal certainty of permanency in the minister's office. But give him an estate at will only, and what becomes of his respectability or his influence? Who will be reproved, by a man, whose official breath is in his nostrils ; and who may, and probably will, be dismissed, as an officious intruder into the concerns of others, if he act faithfully and independently ? And as to the condition of a tenant at will in the priest's office, there is much reason to believe, that the love of property will surmount the love of duty, and that sickness and infirmity will be the signal, at which such a contract will be annulled. Admitting that Doct. *Whitney* and the parish of *Brooklyn* had honest intentions, and acted with ordinary wisdom, the subject matter of their contract demonstrates, that it was intended to be for life, unless determined on reasonable cause shown. A conclusive argument is derived from uniform and universal *usage*. The settlement of a minister has ever been understood to be for life, unless determined sooner, by sufficient cause, and established before a proper tribunal. The legislature, in the law existing at the date of the above contract, speak of a *call* and *settlement* of a minister, in terms the most general and indefinite ; and yet they speak most intelligibly. Every person in the community knows the meaning of these terms ; and that they indicate an estate for life in the minister's office.

Whether by any act or omission, Doct. *Whitney* forfeited his office, and thereby lost the capacity of performing ministerial services, is next to be considered. Were it proper for me to express an opinion, I should not hesitate to say, that the above office was not forfeited, by any thing appearing in the case. But on this subject I consider the question as not within my jurisdiction. The right conferred of performing the duties of a minister, as well as his ordination over a parish, are the acts of an ecclesiastical assembly ; and an ecclesiastical tribunal, vested with powers, in such cases, is the proper *orum* to enquire and determine whether his office is forfeited. If there were no judiciary of this nature, or they should refuse to act, perhaps from the necessity of the case, the enquiry must be made in a court of law. That there is an ecclesiastical judicia-

ry, competent to exercise this branch of its jurisdiction; and that it will, on application, exercise its jurisdiction soundly; I have no hesitation in believing. There are, however, two considerations, that render the question, whether Doct. *Whitney,* by act or omission, has forfeited his office, of no importance. It is not, generally speaking, the effect of an act authorising a forfeiture of office, to forfeit it *ipso facto.* More strictly, the forfeiture lays the foundation of a suit to annul; and a competent tribunal must declare the office forfeited, before this fact may be assumed. *C m. Dig. tit.* Officer. K 11. 12. 13. If this is true, as undoubtedly it is, in relation to an office at common law, on the same reason it is eminently correct, in respect of the authorization of a clergyman to preach and perform ministerial duties. This is rather an employment than an office; and receives the latter denomination on a principle of supposed analogy. It is a monstrous supposition, that every omission or abuse of authority, by a minister, disrobes him of all sacerdotal power, so that every court, and magistrate, and individual in the community, may consider him as destitute of official capacity. If this were so, one omission to administer the communion; one unadvised word or action; any impropriety of omission or commission, might be made a reason, of which every court might judge, to degrade him from his office. If Doct. *Whitney* erred, through mis-judgment or pravity of will, it was competent for the parish to exhibit a complaint against him, before the proper ecclesiastical tribunal, and obtain a legal sentence. In the mean time, his official power would remain; and so far as relates to the society, they may waive the effect of any error committed, and continue their minister in favour. This is the second consideration alluded to.

That the parish of *Brookl n* did waive their right to review the errors of Doct. *Whitney,* if any such there were, is unquestionably manifest. *Aft r* the supposed causes of forfeiture, they requested him to relinquish preaching, on condition that they would secure to him his salary for life; and desired him to ask of the society *a dismission from his pastoral office.* Superadded to this, they paid him his salary regularly, from year to year, down to the fourth of *February,* 1821. Until the 23d of *April,* 1821, more than two months after the salary for which the suit is brought had commenced running, Doct. *Whitney* was, in the most explicit manner, recognised, by the public votes of the parish, as being their minister.

The only remaining enquiry is, whether, on the part of the

*Windham,
July,
1824.*

*Whitney
v.
Brooklyn.*

plaintiff, from *February*, 1821, to *February*, 1822, there was an actual and culpable omission to perform his ministerial duties. He is not required to accomplish impossibilities; nor to preach to those who will not hear him, and who expelled him from his pulpit. On the 2nd day of *November*, 1820, the parish of *Brooklyn* passed a vote, which never has been rescinded, prohibiting their minister from entering the meeting-house of the society to preach or pray, or attend any meeting whatever, except freeman's, society, church and singing meetings. To render the vote effective, a committee was appointed, who, conformably with their trust, actually shut him out of the meeting-house, when attempting to enter it, on the Lord's day, for the administration of the sacrament. If he who is to be benefitted, by another's fulfilling his contract, is the occasion why it is not carried into execution, the party is discharged from his obligation, and the person preventing the performance is subjected to his, precisely as if the corresponding service was done. 1 *Pow.* on *Cont* 418. *Miller* v. *Ward & al. 2 Conn. Rep.* 494.

From the facts admitted, by the parties, at the trial, it clearly results, that Doct. *Whitney* is the minister of the parish of *Brooklyn;* that he has not forfeited his office, nor lost the capacity of performing ministerial services; and that he has actually performed them, except so far as they were prevented by the society. It follows from these positions, that the jury should have been directed, as matter of law, to find their verdict for the plaintiff.

PETERS, BRAINARD and BRISTOL, Js. were of the same opinion.

New trial to be granted.