### DANIEL GIBBS vs. GILEAD ECCLESIASTICAL SOCIETY.

|     |     |
| --- | --- |
| 38  | 153 |
| 58  | 557 |
| 38  | 153 |
| 67  | 479 |
| 38  | 153 |
| 73  | 224 |
| 73  | 726 |

The contract of settlement between a minister and a congregational church and society, is by implication, if not by its terms, for the work of the gospel ministry according to the polity of the congregational denomination of christians, and subject to their platforms, constitutions and usages.

Such a contract is for life unless otherwise expressed; but the contract sanctioned and made operative according to that polity by consociation (if the church is a consociated one) creates a pastoral relation, and that relation may be severed for cause by the formal action of the consociation. Upon such severance pursuant to the polity of the denomination the contract ceases to be operative.

The construction of a written document, where the meaning is to be collected from the document itself, is matter of pure law, and for the court; but where the meaning can only be determined by reference to extrinsic facts or usages, the document and the facts must be submitted to the jury, with such instructions as the court may think proper under the circumstances of the case.

The Saybrook Platform contains a fundamental and important part of the congregational polity, but the fifteen articles of the Platform are not an "only constitution," in the ordinary sense or in an exclusive sense, of the congregational churches. Important portions of congregational polity are to be found in the constitutions, rules and usages of the consociations, and in the usages of the churches, with which the Platform was not intended to interfere.

That Platform, upon careful analysis, is found to provide for a confederation of the churches, under standing councils called consociations, acting as substitutes for the councils which the churches were before accustomed to call. It also provides for an association of pastors. It conferred upon the consociations, appellate and final jurisdiction in cases of discipline. It also conferred upon the association a right to present any of their number accused of scandal or heresy to the consociation for trial. It authorized the consociations to form their own constitutions and by-laws, as they should judge needful. It also conferred upon the consociations the right, and made it their duty, to render assistance to the churches on all occasions ecclesiastical; and properly understood that article of the Platform conferred upon the consociations entire jurisdiction in relation to the settlement and dismissal of ministers. The Platform being otherwise silent on that subject, all questions in relation to it must be determined by reference to the constitution, by-laws and usages of the consociation.

Therefore, where it was claimed that the Platform was the "only constitution of the churches," and the court was requested to charge the jury as matter of law, that inasmuch as the platform did not specifically authorize the dismissal of a minister by the consociation, the power to dismiss on the ground of expediency did not exist, and the court did not so charge, but left it to the jury to say, in view of the provisions of the Platform, and the constitution, by-laws and usages of the consociation, (in relation to which there was evidence in the case), as a controverted question of fact whether the power did or did not exist, it was holden that the course was correct.

VOL. XXXVIII.—20

The dismissal of a minister by a consociation pursuant to a mutual request by both parties, is conclusive and final upon both, without further action by either of them.

If the proceedings of a consociation when convened to act in relation to the dismissal of a minister are in any respect unfair toward him, their proceedings will be holden invalid by the courts, and inoperative upon the contract.

The question whether a minister who is before the consociation upon an *ex parte* call to be heard relative to his dismissal, shall be entitled to a hearing by counsel or not, will depend upon the by-laws of the consociation, if any such exist. If not, the question will be one of fairness or unfairness, dependent upon the particular circumstances of the case.

All witnesses called to testify before the consociation upon any disputed issue should give their testimony under oath or affirmation.

ASSUMPSIT, for salary claimed to be due the plaintiff for services as a clergyman; brought to the Superior Court for Hartford county, and tried to the jury on the general issue with notice, before *Pardee, J.*

The bill of particulars filed in the case was as follows:

| | | |
|---|---|---|
| To services as preacher before settlement from July 28th, 1866, at $10 per Sabbath and board, seven Sabbaths, | $70.00 | |
| To balance due for board, 3½ weeks, at 4.50, | 15.75 | |
| To salary after settlement as agreed, for one year from Sept. 12th, 1866, | 600.00—685.75 | |

Cr.

| | | |
|---|---|---|
| By cash at sundry times, | | 393.84 |
| | | $291.91 |

Interest from Sept. 12th, 1867.

The defendants were a religious society of the congregational order. On the trial the plaintiff offered in evidence the call of the church and society, made in August, 1866. The vote of the latter was "to extend a call to the Rev. Daniel Gibbs to settle with us in the ministry of the gospel, and that we pay him $600 annually, and the use of the parsonage buildings and parsonage grounds, if he settles with us in the ministry." He also offered evidence to prove his acceptance of the call, his installation by a mutual council, and that he was, during the year for which the salary was claimed, ready and willing to perform the duties of pastor. It was admitted

that no pastoral service was performed by the plaintiff after March 27th, 1867.

It was admitted that the church was a consociated church connected with the consociation of Tolland county, and that the plaintiff as pastor of the church was a member of that consociation. The defendants offered in evidence the unanimous votes of all the members of the church and society present at meetings duly warned, requesting the plaintiff to unite with them in a mutual council for his dismission, if deemed expedient by the council; also evidence that the committees of the church and society informed the plaintiff of these votes, and of the reasons which induced the church and society to desire his dismission, to wit, that there was general alienation from and dissatisfaction with him, and that by reason of this his usefulness as a minister in that place was at an end; also that the plaintiff declined to unite in the call, alleging as the reason of refusal that the grounds assigned were not sufficient. The defendants also offered evidence to show the unanimity of the church and society in desiring the dismission of the plaintiff, a subsequent request of individual members of the church and society that he would unite in a call for the consociation for the same purpose, and a refusal on his part to accede to the request.

They also offered in evidence the unanimous votes of all the members of the church and society present at meetings legally warned for that purpose, requesting the consociation of Tolland county to be convened for the purpose of dissolving the pastoral relation, if by them deemed expedient; and further offered in evidence the proceedings of the consociation which assembled in pursuance of said request. The record of these proceedings was as follows:

"A special meeting of Tolland consociation called at the request of the congregational church and society in Gilead, by letters missive issued by two pastors in consequence of the removal of the last moderator, was held at the meeting house in Gilead, on Wednesday, March 27th, 1867, at 12 o'clock M., for the purpose of dissolving the pastoral relation existing between Rev. Daniel Gibbs and the congregational church

and society in Gilead, if it should be deemed expedient. (The record after giving the names of the members present, proceeded as follows:) Consociation was called to order by the scribe, and Rev. A. Marsh was chosen moderator. Prayer was offered by the moderator. The rules of the consociation were read. The letter missive calling the present meeting was read. Rev. Daniel Gibbs was enquired of if he would now unite with the church and society in making the consociation a mutual one. He replied in the negative, through Z. A. Storrs, Esq. whom he offered as his counsel. The consociation were by themselves. It was voted that Mr. Gibbs be not allowed to appear by counsel.

" The following documents were read. 1. The vote of the congregational church in Gilead to petition two of the pastors of Tolland consociation to convene that body, for the purpose of dissolving the pastoral relation existing between Rev. D. Gibbs and the church and society in Gilead. 2. The vote of the ecclesiastical society in Gilead, concurring with the church in Gilead, in petitioning two pastors to convene the consociation for the dismission of Mr. Gibbs. 3. The call of the church to act on the subject of convening the consociation being called for, was presented and read. 4. The action of the Gilead Ecclesiastical Society, taken Feb. 16th, 1867, concurring with the church in requesting the pastor, Rev. D. Gibbs, to unite with them in calling an ecclesiastical council for his dismission, and, he refusing thus to do, to issue letters missive to convene a council ; also the action of the church in Gilead, taken Feb. 14th, 1867, requesting Mr. Gibbs to unite with them in calling an ecclesiastical council for his dismission; also the action of the church taken Feb. 16th, 1867, upon the refusal of Mr. Gibbs to unite with the church in calling a council, appointing a committee to manage the case of the church before the council, were called for and read. 5. A petition of twenty-one of the thirty-one voting members of the church in Gilead to two pastors of Tolland consociation, requesting them to convene that body, dated March 11th, 1867, and also a petition of sixteen of the twenty members of the ecclesiastical society in Gilead to two pastors

of Tolland consociation, requesting them to convene that body, dated March 11th, 1867, were called for and read.

"The committee of the church and society were heard with reference to the subject in hand. The pastor was also heard with reference to the same subject. The consociation were by themselves. After full discussion the following vote was taken as expressing the result of council. 'Voted that the consociation deem it expedient that the pastoral relation existing between Rev. Daniel Gibbs and the congregational church and society in Gilead be dissolved, and the same is hereby dissolved.' The minutes were read and approved. Adjourned without day."

It was agreed that the plaintiff, subsequent to his refusal to join in calling a mutual council, offered to unite in calling one to meet at the expiration of the first year of his ministry.

It was agreed that the Saybrook Platform is the ecclesiastical constitution of the consociated churches of Connecticut, and a copy of it was laid in as evidence in the case. The defendants offered much evidence to show that, as a matter of usage, when a minister of a consociated church and society refuses to unite with the church and society in a call for a mutual council to dismiss him upon the ground of expediency, then the church and society, by virtue of the Saybrook Platform, have the right to request the consociation to be convened for the purpose of considering the question of dissolution upon the ground of expediency; and claimed that, in the present case, the consociation, having been so convened by a general letter missive for that purpose, had the right, if they saw fit, to dismiss the plaintiff upon such ground, and that the result to which the council came was ecclesiastically a final one; also that the preliminary steps of the church and society were such as to bring the case in an orderly manner before the consociation, in accordance with the Platform and the usage and rules of the consociation and of the consociated churches of Connecticut.

They also claimed that under the Platform the consociation had jurisdiction of the case as presented to them by the church and society, and that in their manner of assembling,

proceeding, hearing, and determination, they acted in accordance with the Platform and laws and usage of the Congregational order, without malice, and gave the plaintiff a fair and reasonable hearing, and opportunity to make his defence; and that the church and society accepted the result to which·the consociation came, entered the record of the consociation in their records, and appointed a committee to supply the pulpit; that the result was satisfactory to them, that they immediately proceeded to obtain the services of another minister, and notified the plaintiff that they did so accept said result, and regarded him as dismissed; and that as a matter of ecclesiastical law he was duly dismissed by the consociation.*

*The Saybrook Platform consists of fifteen articles. The following are all that are important to the present case.

" 2.   That the churches which are neighboring each to other shall consociate for mutual affording to each other such assistance as may be requisite upon all occasions ecclesiastical. And that the particular pastors and churches within the respective counties in this government shall be one consociation, (or more if they shall judge meet), for the end aforesaid.

" 3.   That all cases of scandal that fall out within the circuit of any of the aforesaid consociations, shall be brought to a council of the elders and also messengers of the churches within the said circuit; i. e., the churches of one consociation, if they see cause to send messengers, when there shall be need of a council for the determination of them.

" 5.   That when any case is orderly brought before any council of the churches, it shall there be heard and determined, which (unless orderly removed from thence) shall be a final issue, and all parties therein concerned shall sit down and be determined thereby. And the council so hearing and giving the result or final issue in the said case as aforesaid, shall see their determination or judgment duly executed and attended, in such way or manner as shall in their judgment be most suitable and agreeable to the Word of God. .

" 6.   That if any pastor and church doth obstinately refuse a due attendance and conformity to the determination of the council that hath the cognizance of the case and determineth it as above, after due patience used, they shall be reputed guilty of scandalous contempt, and dealt with as the rule of God's Word in such case doth provide, and the sentence of non-communion shall be declared against such pastor and church. And the churches are to approve of the said sentence by withdrawing from the communion of the pastor and church which so refuseth to be healed.

" 7.   That in case any difficulties shall arise in any of the churches in this colony which cannot be issued without considerable disquiet, that church in which they arise, (or that minister or member aggrieved by them), shall apply themselves to the council of the consociated churches of the circuit to which the said church belongs, who, if they see cause, shall thereupon convene, hear and

Both the plaintiff and defendants offered much testimony from persons expert in the ecclesiastical law of the congregationalists of Connecticut, upon the question of the jurisdiction of the consociation over dismissions upon the ground of expediency, one party not uniting in the request for the assembling of the consociation.

The evidence of the plaintiff on this point tended to show that a minister of a consociated church, if he refused to unite in the call for a council or consociation, could only be dismissed for heresy or scandal, or that he must have full notice of the particular offence claimed to have been committed by him a proper time before the hearing, and could only be tried for the offence so specified; that these charges must, in the first place, be presented to the association under the 13th section of the Saybrook Platform, and be proceeded with as therein set forth, and that the consociation had no power to dismiss him in any event merely because it thought it was

determine such cases of difficulty, unless the matter brought before them shall be judged so great in the nature of it, or so doubtful in the issue, or of such general concern, that the said council shall judge best that it be referred to a fuller council, consisting of the c· urches of the other consociations within the same county, (or of the next adjoining consociation of another county, if there be not two consociations in the county where the difficulty ariseth), who, together with themselves, shall hear, judge, determine, and finally issue such case according to the Word of God.

" 8. That a particular church in which any difficulty doth arise, may, if they see cause, call a council of the consociated churches of the circuit to which the said church belongs, before they proceed to sentence therein, but there is not the same liberty to an offending brother to call the said council before the church to which he belongs proceed to excommunication in the said case, unless with the consent of the church.

" 12 That the teaching elders of each county shall be one association, (or more, if they see cause), which association or associations shall assemble twice a year at least, at such time and place as they shall appoint, to consult the duties of their office and the common interest of the churches, who shall consider and resolve questions and cases of importance, which shall be offered by any among themselves or others, who also shall have power of examining and recommending the candidates of the ministry to the work thereof.

" 13. That the said associated pastors shall take notice of any among themselves that may be accused of scandal or heresy unto or cognizable by them, examine the matter carefully, and if they find just occasion, shall direct to the calling of the council, where such offenders shall be duly proceeded against."

expedient that he should be dismissed, without any such offence on his part.

The evidence on the part of the defendants on this point tended to show that the consociation was a standing mutual council; that in addition to the power of trying, censuring, deposing, or dismissing a minister for an ecclesiastical crime or fault, (which trial being in the nature of judicial proceedings should be procceded with substantially after the manner set forth in said 13th article), the consociation had also the power, provided the question was submitted to them by one of the parties, of dismissing a minister upon the ground of expediency, whenever the church and society by a large majority desired that he should be dismissed, and that to the latter case the provision of the 13th article had no relation, and was not applicable; and that the action of the Tolland county consociation was in all respects in due and proper form; also that such a dismission was not considered to be a judicial proceeding, or in the nature of a judicial proceeding, but was a part of the general powers conferred by the Platform.

It was admitted on the trial that no " complaint" or " charges" were made before the consociation, and that the dismission of the plaintiff was sought and granted on the ground of expediency, it being claimed that there was a general alienation and dissatisfaction with the plaintiff on the part of the church and society.

It appeared from the evidence, and was admitted, that the only ground upon which the consociation claimed to dismiss the plaintiff was the ground of expediency; that none of the reasons upon which this expediency was claimed to be founded were stated in the letter missive, or in any way reduced to writing and given to the plaintiff before or during the meeting of the consociation; that the plaintiff during the meeting requested to know what the charges were against him, and was informed by the moderator that there were no charges against him, but that the only question before them was whether they thought it was expedient that he should be dismissed; that no complaint of any fault or crime on the part of the plaintiff was ever made to the association, or to the

consociation itself, and that no claim of any fault or crime on the part of the plaintiff in any way came before the consociation.

The plaintiff offered in evidence the following rule of the Tolland county consociation: "All testimony received by this consociation in its judicial capacity shall be under oath or affirmation, as now provided by law." The evidence before the consociation was not under oath or affirmation. The defendants offered evidence to show that the term "judicial capacity" was confined to trial under the 13th article for ecclesiastical crime or fault.

The plaintiff offered evidence to prove that he was a presbyterian, unacquainted with the powers and methods of proceeding of consociations, and that at the meeting of the consociation he had provided himself with counsel who was a member of a congregational church, and that the plaintiff stated to the consociation that his counsel would answer for him, and that the consociation declined to allow the plaintiff to appear by counsel, and that he was prevented from fully stating his grounds of defence and the real reason for the dissatisfaction which it was claimed existed in the church and society.

The defendants offered evidence to show that they had no lawyer, that the consociation informed the plaintiff that he should have all his rights, and requested him to be heard by himself, and that thereupon he did appear and take part in the proceedings, and that he occupied much time in stating his legal position, and that full and free opportunity was given to him to be heard upon the subject submitted to them, and that the consociation proceeded fairly, reasonably, and without malice. Also that by the rules of the Tolland county consociation the question of the propriety of permitting persons to appear by counsel was one to be decided by the consociation in each particular case, according to the nature of the particular subject before them.

The defendants also offered evidence to show that the plaintiff was well aware of the nature of the question to come before the consociation, and of the reason why the church

and society desired his dismission, and that he had been fully informed thereof by the committees of both; and that he was acquainted with the powers and method of proceeding of consociations. .

The plaintiff requested the court to charge the jury as follows: " That a council of consociated churches has no power to dismiss a minister, but can only advise what it deems expedient to be done, and that such advice must state the facts found by the council as the grounds of such expediency, and that a vote of the church and society founded on such advice is necessary for such dismission.

" That such council has no power to dismiss a minister merely because it deems it expedient that he should be dismissed, but must, after a full and fair trial, find him guilty of such acts as will by law authorize his dismission; that in case of a church consociated under the Saybrook Platform as ts only constitution the only causes for which a minister can be dismissed are those of scandal or heresy, and that they must be presented to the consociation through the association under the 13th section of the Saybrook Platform.

" That the only method of dismissing the plaintiff was by the church and society exhibiting a complaint against him, accusing him of some improper conduct before the proper ecclesiastical tribunal, giving him notice of what such accusations were, and obtaining a legal sentence after a full and fair hearing, and that upon such hearing the testimony must be under oath or affirmation.

" That before a council of consociated churches can be called to act upon the dismission of a minister, he not joining in the call, the church and society must state fully to him the grounds and reasons on which they propose to ask for his dismission, and request him to join with them in a mutual council or consociation to decide whether in fact such grounds exist; and that, if such grounds are not in law sufficient for his dismission, he is not bound so to join, and no council can be called without his consent.

" That when a pastor appears before a council, having had no other notice of the grounds of the proceeding but a letter

missive setting forth no complaint, and requests of the council a statement of the reasons why his dismission is claimed to be expedient, and such request is refused and no such statement is furnished, and he is informed by the moderator that there are no charges against him, then the action of the consociation would not be a bar to the present suit.

"That the refusal to the plaintiff of the assistance of counsel as claimed to be proved by the plaintiff, if found to be proved, would avoid the proceedings of the consociation.

"That the proceedings of the consociation being founded only upon evidence not under oath or affirmation were invalid.

"That the vote or "result" of the consociation, not showing any grounds or reasons for dismissing the plaintiff except that the consociation deemed it expedient that he should be dismissed, is invalid, and the proceedings were no bar to the suit.

"That the proceedings of the consociation in the case at bar for the reasons aforesaid were invalid, and not in law any defence to the action."

The court refused to charge the jury as requested by the plaintiff, but charged as follows :

"That the plaintiff was by law settled over the Gilead Ecclesiastical Society for his life, subject to a dissolution of the pastoral relation by the proper ecclesiastical tribunal having jurisdiction of the case, and proceeding according to the rules and usages of the denomination, fairly and without malice ; that if the pastoral relation was so terminated according to the rules and usages of the congregational denomination, and the church and society accepted the result, the plaintiff's right to his salary thereafter ceased.

"That it was admitted that the consociation upon proper presentment had power to terminate the plaintiff's pastoral relation, but that the power of the consociation to terminate it upon the ground of expediency was a controverted fact in the case."

And the court submitted the question to the jury upon all the evidence in the case, whether, under the constitution of the congregational churches, the consociation had the power

to dissolve the ecclesiastical relation for the cause of expedi-
ency.   The court further charged,

." That if the consociation was duly convened, and had the
power to dismiss the plaintiff, it must act without malice, pro-
ceed fairly, give the plaintiff a fair and reasonable opportunity
to be heard, and proceed in accordance with its rules and
usages and the constitution.

" That if the jury were of the opinion that the refusal to
allow counsel to the plaintiff, or the receiving testimony not
under oath, was not in accordance with such rules and usages,
or was unfair, or that the plaintiff did not have a fair and
reasonable opportunity to be heard, then the action of the
consociation was invalid.

" That if the plaintiff had not sufficient time and opportu-
nity to be present and state his case, and was not informed
of the reasons for which the church and society sought a dis-
mission ; that if the " result" in which the consociation em-
bodied their decision was not in accordance with the rules and
usages of the congregational churches, or if it was the duty
of the consociation, acting fairly and in accordance with the
rules of the churches, to express in their " result" the reasons
why the defendants desired the dismission and it was expedi-
ent that he should be dismissed; then the action of the con-
sociation was invalid.

" That if the jury believed from all the evidence that the
preliminary steps of the church and society were such as to
bring the case in an orderly manner before the consociation,
in accordance with the Platform and with the usages and
rules of the Tolland county consociation, and that under the
Platform the consociation had jurisdiction over the matter in
controversy, and that in their manner of assembling, proceed-
ing, hearing and determination they acted in accordance with
the Platform and laws and usages, and without malice, and
gave the plaintiff a fair and reasonable hearing and opportu-
nity to make his defence, they had power to dissolve and did
dissolve the pastoral relation, the result having been accepted
by the church and society.

"And that the defendants were bound to communicate their

acceptance to the plaintiff, but that a formal vote was not necessary.

"And further, that the burden of proof was on the defendants."

The jury returned a verdict in favor of the plaintiff for $3.87 damages, and costs. The plaintiff moved for a new trial for error in the charge of the court.

*C. E. Perkins,* in support of the motion.

*N. Shipman,* contra.

BUTLER, C. J. The supposed errors of the court below for which a new trial is claimed relate exclusively to the manner in which the case was submitted to the jury. Injustice may have been done the plaintiff by the proceedings of the church and society in Gilead, and of the consociation of Tolland county, and by the verdict of the jury, but we cannot revise their proceedings on this motion except so far as they constituted the subject-matter of the requests made to the court in relation to the charge. Looking then at those requests, the facts involved in them, and the charge as made, we are all satisfied that the case was fairly and legally presented to the jury, and whatever we may think of their verdict it was their province to render it, and it would be going beyond our province to set it aside and grant a new trial on the grounds presented in the motion.

The plaintiff sought to recover a sum of money which he claimed to be due as balance of a year's salary on a contract made with the defendants. The contract was made in connection with a *settlement,* by which an ecclesiastical pastoral relation was created between the plaintiff and defendants and the church connected with them. The contract was in writing, and consisted of a vote by the church " to extend a call" to the plaintiff " to *settle* with them *in the work of the gospel ministry,*" and a like vote of the society in substantially the same terms, with a proposition to pay the plaintiff a salary of $600 annually, with the use of the parsonage grounds and

buildings. The call was accepted and became a contract, and the church being a consociated one, the plaintiff was duly settled and established in the pastoral office and relation with the consent and by the formal action of the consociation to which it belonged.

The contract was in the form usually adopted in such cases, and it is undoubtedly true that such settlements are, by implication, for the work of the gospel ministry according to the polity of the congregational denomination of christians, and subject to their platforms, constitutions, and usages, and the contracts for the payment of salary are dependent upon the existence of the pastoral relation, and cease to be operative whenever that relation ceases to exist. This was substantially conceded on the trial, and it was further conceded that the pastoral relation between a minister and a consociated church, under the congregational polity, though theoretically formed for life, can be severed at the request of the parties, or for cause, by the formal action of the consociation with which the church and society are connected.

There was a severance in form of the pastoral relation in this case by the consociation of Tolland county, and *primâ facie* a termination of the contract for salary. But the severance was upon an *ex parte* application by the church and society, against the consent of the plaintiff, and notwithstanding his protest. He claimed upon the trial that, under the Saybrook Platform as the constitution of the churches, the consociation has not the power or right to sever the pastoral relation upon the application of one party only, and because they deem it *expedient* that it should be severed, and that the action of the consociation was in that respect unauthorized, and in other respects informal, unfair, and invalid, and that the severance was inoperative upon the contract. These claims were denied by the defendants, and the claims thus made and denied constituted the material issues upon which the case was tried.

To establish his claim in relation to the first issue, namely, that the consociation had no power to dismiss for expediency, the plaintiff claimed that the fifteen articles of discipline of

the Saybrook Platform were the constitution of the congrega-
tional churches of Connecticut, and that they conferred no
power on the consociation to dismiss on the ground of expe-
diency, and, assuming that the power could not otherwise ex-
ist, requested the court so to charge the jury. The court did
not so charge, but left the jury to determine, as a controverted
question of fact, from the Platform and all the other evidence
offered in the case, whether the consociation had such power
or not. The plaintiff claims that the court erred in thus
charging and refusing to charge, and thus presents the first
point made in the case.

It is undoubtedly true, as a general rule, that the construc-
tion of a written document, where the meaning is to be col-
lected from the document itself, is matter of pure law, and
for the court. But that rule, as is evident from the qualifica-
tion embraced in it, cannot be strictly applied in all cases. It
was not applicable in this.

The plaintiff's " work in the gospel ministry" was to be in
accordance with the congregational polity, and his pastoral
relation subject to its usages and laws. That polity and those
usages and laws are not all contained in the Platform, nor is
it, in any just sense, " the only constitution of the churches,"
as assumed in the plaintiff's request. That polity is contained
in the congregational theory of the nature of a christian
church; in the usages of the churches in respect to mutual
communion and assistance which existed when the Platform
was adopted, and which were not affected by its provisions;
in all the work of the Synod of 1708 at Saybrook, including
the "Confession of Faith," " Heads of Agreement," and "Ar-
ticles of Discipline "; in the self-adopted constitutions, rules
and by-laws of the consociations, and their interpretations
and modifications of the Platform; and in the corresponding
usages adopted by the consociations, associations, and
churches, since associations and consociations were organized.

The fundamental idea of congregational polity, under which
the churches of New England were gathered, was that " par-
ticular societies of visible saints, who under Christ their
head are statedly joined together for ordinary communion

with one another in all the ordinances of Christ, are particular churches, having right to choose their own officers, and admonish, discipline and excommunicate scandalous and offending members. The churches of Connecticut were therefore substantially independent, but they recognized the importance of mutual communion and assistance, and in cases of difficulty councils were common. They also recognized the importance of associations of pastors for mutual advice and brotherly intercourse. But the usages in relation to mutual communion and assistance, as they existed prior to 1708, were found insufficient for the preservation of harmony and peace in and among the churches. "For the want of a more energetic government," says Trumbull in his History, "many churches ran into confusion, and councils were not sufficient to relieve the aggrieved and restore peace." In order to establish a more energetic government the General Assembly provided for the calling of a Synod at Saybrook by the following act:

"This Assembly from their own observation and the complaint of many others being made sensible of the defects of the discipline of the churches of this government, arising from the want of a more explicit asserting of the rules given for that end in the Holy Scriptures, from which would arise a permanent establishment among ourselves, a good and regular issue in cases subject to ecclesiastical discipline, glory to Christ our head, and edification to his members, hath seen fit to ordain and require, and it is by the authority of the same ordained and required, that the ministers of the several counties in this government shall meet together at their respective county towns, with such messengers as the churches to which they belong shall see cause to send with them, on the last Monday in June next, there to consider and agree upon those rules and methods for the management of ecclesiastical discipline which by them shall be adjudged agreeable to the Word of God, and shall at the same meeting appoint two or more of their number to be their delegates, who shall all meet together at Saybrook at the next Commencement to be held there, where they shall compare the results of the

meetings of the several counties, and out and from them draw a form of ecclesiastical discipline."

The Synod met pursuant to the act, and adopted a Confession of Faith, Heads of Agreement, and Articles of Discipline, together constituting the "Platform," and the object and purpose, it thus appears, was to confederate the churches into "a permanent establishment," and provide for a good and regular issue in cases of difficulty or ecclesiastical discipline; the regular introduction of candidates into the ministry; and the promotion of order and harmony among the ministers and churches. Some of these objects were foreshadowed in the Heads of Agreement, which originated in England and were adopted here, but they were provided for in the fifteen articles of discipline to which the term "Platform" is specifically applied by the plaintiff, and under which consociations and associations were organized.

If now we analyze those articles, we find that the first relates exclusively to the method of discipline within a particular church, and has no bearing on the questions at issue. The second, which is the most important one, is as follows:

"That the churches which are neighboring each to other shall consociate for mutual affording to each other such assistance as may be requisite upon all occasions ecclesiastical. And that the particular pastors and churches within the respective counties in this government, shall be one consociation, (or more if they shall judge meet), for the end aforesaid."

The third provides that all cases of scandal shall, if needful, be determined by the consociation.

The fourth provides that all acts and judgments of the consociation shall be passed by a majority of the elders (now called pastors) present, and such number of the messengers (delegates) as makes a majority of the council.

The fifth article provides that the determination shall be final, and the sixth that such determination may be enforced against pastor or church who refuse to accept the decision, by non-communion as for scandalous contempt.

The seventh provides for application to consociation by any

minister or church member, to settle any serious difficulty, and in cases of great difficulty for the sitting of two consociations as one council.

The eighth provides that a church may thus apply to consociation before sentence, but an offending brother shall only apply after sentence, unless with the consent of the church.

The ninth simply provides for a lay delegation.

The tenth provides for a meeting of the pastor and delegates of the churches in the respective counties, for the organization of consociations, and that " all councils (consociations) may prescribe rules as occasion may require, and whatsoever they shall judge needful within their circuit for the well performing and orderly managing of their several acts to be attended by them, or matters that come under their cognizance."

The eleventh provides that parties and witnesses not appearing before consociation, without satisfying reason, shall be judged guilty of scandalous contempt.

The remaining three articles relate exclusively to associations ; provide for county associations of ministers ; the licensing of candidates by them ; that they shall take notice of those amongst themselves who may be accused of scandal or heresy, and present them to the consociation ; advise bereaved churches ; and recommend a general association to be holden each year.   These associations have no power, and are simply consulting and advisory bodies.   Arranged in proper order and expressed in clear language where obscure, the articles provide for a confederation of the churches under standing, substitute, ecclesiastical councils, with all the powers which councils then had by the usages of the churches, and the added elements and jurisdiction of an effective, disciplinary, judicial tribunal, viz :

1.  For the self-organization of standing consociated councils, called consociations (Art. 2) county-wise (Art. 2–10), at meetings to be called for that purpose by the ministers in the county towns (Art. 10), to be composed of pastors (then called elders) and messengers (lay-delegates) (Art. 2, 3, 9, 10), and " to prescribe rules as occasion may require, and whatsoever they shall judge needful within their circuit

for the well-performing and orderly managing their several acts to be attended by them, or matters that come under their cognizance." (Art. 10.)

2. That their mode of proceedure be pursuant to such rules as they shall adopt (Art. 10), and, according to the (then) common practice of the churches, by major vote of the elders (pastors) present concurring, and such a number of the messengers (delegates) present as makes the majority of the "Council." (Art. 4.)

3. That they shall have jurisdiction,—First, to afford to the churches " such assistance as may be requisite upon all occasions ecclesiastical" (Art. 2), that is, occasions when by the usage of the churches councils were proper. Second, of all cases of scandal that fall out within the circuit of the consociation. (Art. 3.) Third, " in case any difficulties arise in any of the churches in this colony which cannot be issued without considerable disquiet." (Art. 7.) Fourth, in respect to cases where a minister is " accused of scandal or heresy unto, or cognizable by, his associated brethren." (Art. 13.)

4. The mode by which they may acquire jurisdiction may be,—First, upon application of any church, " in case any difficulty should arise in it which cannot be issued without considerable disquiet," and in such case also on application of the minister, or any member aggrieved by the difficulty. (Art. 7.) Second, in cases of discipline, on application by a particular church before sentence, or a member disciplined after sentence. (Art. 8.) Third, upon the call of an association, where any one among themselves be accused of scandal or heresy unto or cognizable by them. (Art. 13.)

5. As to the power of consociations to enforce the attendance of parties or witnesses, there is provision (Art. 11) as follows: " That if any person or persons orderly complained of to a council, or that are witnesses to such complaints, (having regular notification to appear), shall refuse or neglect to do so in the place and at the time specified in the warning given, except they or he give some satisfying reason thereof to the said council, they shall be judged guilty of scandalous contempt."

6. In respect to the determination or judgment of consociation, it is provided that " it shall be final (unless orderly removed from thence), and that all parties therein concerned shall sit down and be determined thereby." (Art. 5.) And it is further provided that parties who do not submit shall be reputed guilty of scandalous contempt, and punished by noncommunion.

From this analysis it is apparent, in the first place, that the Platform did not abrogate or annul any of the then existing practices and usages of the churches which were not inconsistent with its special provisions.

It is apparent, in the second place, that it is not " an only constitution," as claimed, or in the ordinary or any technical sense of the term, but an instrument for the *confederation* of the churches, under standing authoritative councils, for the perfection of discipline, the issuing of difficulties, the preservation of the faith, and the rendering of assistance " on all occasions ecclesiastical." It was not obligatory on any church as a part of its organic law. The independence of the churches is recognized in the " Heads of Agreement" expressly, and impliedly in the first and second articles of the Platform. Any one or more of the churches could accept or reject it, or, accepting, could at any time secede from its connection with the consociation, without offence or loss of standing as a church of Christ. The learned compilers of the work entitled "Congregational Order," which has been read from in the argument and is authority with the denomination, tell us that when that compilation was made, (A. D. 1842), there were in the state about fifteen churches not consociated, some of which had seceded from the consociations, and some of which had never joined one.

It is apparent, in the third place, that the consociations were at liberty to make their own constitutions, rules and bylaws, " as they should judge needful," without power of review or control by any constituted body or court, but subject to the specific provisions of the Platform, and, by implication, to its spirit and purpose, and the faith and polity of the churches.

It is further apparent that, under such circumstances, di-

versity of interpretation to some extent by the churches, and by the consociations in the formation of their constitutions and rules, and corresponding practical modifications of the Platform, were natural. On this point the compilers of the "Order" say:

" In general there has been some diversity of interpretation from the earliest period. Some pastors and churches, and some of the ecclesiastical bodies, have interpreted the articles with greater latitude, and others with less. But so far as information has been obtained, we find that all the associations and consociations in the state have from the beginning recognized, and that they *do still* recognize, the Platform as the basis of their organization and of their proceedings. Most or all of them, however, have their codes of by-laws and their written constitutions, still referring to the Platform as their charter." (Congregational Order, page 265.)

These facts would be sufficient, if there were nothing more in the case, to show that the fifteen articles of the Platform did not form the entire and only constitution of the churches; that they contain specifically a part, and a part only, of their polity; that their meaning in respect to the questions at issue could not be derived from the instrument itself, so as to determine the issues between the parties, and that it was proper that they should go to the jury in connection with the evidence of the usage of the churches, and the cotemporaneous exposition, interpretations and modifications which it received from them, in the organization and action of the consociations.

But this is by no means all there is in the case which bears upon the point. This will appear as we examine in their order the propositions contained in the plaintiff's requests in relation to the charge.

The first of these propositions was that the action of a consociation in dismissing a minister, on a mutual call, is advisory merely, not obligatory, without further action by the pastor or church. That proposition has not been pressed in argument here, and cannot be maintained. A dismissal pursuant to *mutual* request of both parties is conclusive and final without further action by either of them.

The second proposition was that a consociation has no power to dismiss a minister on an *ex parte* call, merely because they deem it expedient that he should be dismissed, but that under the Saybrook Platform, as the only constitution of the churches, a minister could only be dismissed for scandal or heresy, after a full and fair trial, upon presentation through the association of which he was a member. The court could not properly so charge as matter of law.

The Platform is silent in relation to the settlement and dismissal of ministers. The Heads of Agreement recognized the importance of the ordination of a minister to his office over the church by the pastors of neighboring congregations, and such was the practice both as to ordinations and dismissals long anterior to the adoption of the Platform. It was not the purpose of the Synod to interfere with or control that practice, or any other of the usages of the churches through councils, except to provide a permanent or standing council by which the work should be done. Hence the second article of the Platform, which provides for the consociations, provides that they shall " afford assistance to the churches upon all occasions ecclesiastical." In their commentary upon this article the compilers of the "Order" say :

"*Assistance upon all occasions ecclesiastical.* Usage includes ordinations, installations and dismissions of pastors ; examination of candidates for ordination or installation, in respect to their soundness in the faith and their qualifications for the work of the ministry ; occasions in which advice is regularly asked by the churches or individual members ; the hearing of appeals from the decisions of a consociated church ; hearing and determining cases of discipline or difficulty submitted to the consociation previous to trial ; trial of pastors accused of scandal or heresy on complaint or call of the association ; and in general, deliberation and advice concerning matters of common interest to the churches." (Cong. Order, page 268.)

It is apparent that the ordination and dismissal of ministers by councils was an "occasion ecclesiastical," a usage and practice existing when the Platform was adopted, with which the

Synod did not intend to interfere, except to provide that the standing council—the consociation—should perform the duty; and that the power of the consociation in respect to dismissals was not defined or limited by them. The extent to which that power should be exercised by consociations was left to their discretion, acting under their self-adopted constitutions and rules, and the usages of the churches. Whether therefore councils or consociations had assumed to dismiss on the ground of expediency, and the churches had acquiesced until it had become a settled usage to do so, was a question of fact which could not be determined by the Platform, but must be determined by the jury. So the parties understood it upon the trial, for both parties went at great length into the inquiry from learned divines and experts without any objection on either side. The court very properly declined to attempt to settle the question by the Platform as matter of law, but left it, as the parties had presented it, as a controverted fact for the jury.

Another connected proposition was that under the Platform the consociation had no power to dismiss a minister for any cause on an *ex parte* call, except scandal and heresy; nor for those causes unless the call was made and charges presented by the association of which the offending pastor was a member. This proposition may be true as to heresy, but the third article also gives the consociation jurisdiction of all cases of scandal which fall out within the circuit, and the seventh article gives a right of application to the consociation, in any case of difficulty in any of the churches, to the church, minister or any member aggrieved. Moreover the language of the thirteenth article is peculiar; it is " scandal or heresy *unto* the association." Whether, therefore, it was intended that charges of scandal or heresy against a minister should be first made to the association of which he is a member, or can be made by the church or aggrieved members of the church directly to the consociation, is left in doubt. Referring again to the "Order," we find it stated that a different practice prevailed at the time that was published in different consociations. What practice prevailed or was recognized

generally, and particularly in the Tolland county consociation, would have been a necessary fact to be considered as matter of cotemporaneous exposition, and the Platform and the fact must have gone to the jury, if the question had been a material one in the case. But the question was wholly immaterial. The action of the consociation was not founded upon *any charges* of *any kind,* and the court properly declined to charge as requested.

Other propositions contained in the requests relate to the fairness or unfairness of the proceedings of the consociation. In respect to those it is sufficient to say that the court charged the jury as requested, that if the proceedings were unfair they were invalid.

Another proposition was that the plaintiff was entitled to be heard by counsel. The Platform says nothing upon the subject, and so far as the question was an ecclesiastical one it was determinable at the discretion of the consociation. There was no rule of the consociation on the subject, and on referring to the "Order" we find the practice was different in different consociations, and we know of no rule of law that can control in such a case. But the question whether counsel should be allowed or not is always involved in that of the fairness or unfairness of the trial, and dependent upon the particular circumstances of the case. Where no charges are made, and no contested issue is to be tried, it cannot be said as matter of law that either party is entitled to counsel. Presumptively, legal counsel are not necessary to enable an ecclesiastical body to determine a question of ecclesiastical polity correctly. In this case there were no charges to be tried, and the only question was that of expediency. If criminal charges are to be tried it may be unfair to refuse counsel.

A further request was that the court should charge " that the proceedings of the consociation, being founded upon evidence not under oath or affirmation, were invalid." The court could not properly so charge. No foundation was laid for the claim. The assumption of fact embodied in the request was untrue. No issue of fact is shown on the motion to have been formed or assumed between the parties before

consociation, nor does it appear that any oral evidence was offered or received. The *motion* indeed says that the evidence before the consociation was not under oath or affirmation, but the *record* of that body, which is full and spread out in the motion, contains the reason. There was no issue before them requiring oral evidence, and all the evidence offered or received was correspondence or copies of votes showing the alienation. After these were read both sides addressed the consociation. The record is " The committee of the church and society were *heard* with reference to the subject in hand." " The pastor was also heard with reference to the same subject." The import is that they were heard by way of argument, not as witnesses. Clearly the court would have erred if they had charged in conformity to that request. Whether they were sitting and acting in a judicial capacity or not was immaterial therefore. A court cannot err with respect to the reception of evidence which is neither offered nor received. We may say, however, that if it clearly appeared by their record or the motion that *oral testimony* was offered and received *as such*, which was not under oath, and to prove any material disputed fact, we should have had no difficulty in respect to the capacity in which the consociation were convened and acted, or the duty of the court below to charge as requested. Their action was an *adjudication* in form and effect ; but, as far as appears, founded on record evidence alone of such alienation as in their judgment rendered it expedient that the pastor should be dismissed. The charge as given left the matter of that request fairly to the jury, and was more favorable to the plaintiff than he had a right to demand.

Upon the whole case it is obvious that the only material question involved is, whether the pastoral relation between a minister and a consociated congregational church and society can be dissolved by a consociation, upon application by the church and society only, when church and society are dissatisfied with him, and his usefulness is at an end. There are no legal precedents to aid in determining the question. In the case of *Whitney* v. *Brooklyn*, 5 Conn., 405, there had been no dismissal; and the Massachusetts decisions are not applicable,

for their churches are not confederated by consociation. The Saybrook Platform has no provision in relation to the ordination or dismission of a minister, and contains nothing which can be construed to confer or limit the power of a consociation to dismiss on the ground of expediency. The power, if it exists, rests upon usage—the assumption of its exercise by the consociations, and the acquiescence of the churches. Therefore whether it exists or not is a question of fact, which it was not the province of the judge below to determine, nor is it our province to determine it. We may doubt, as some of us do doubt, the existence of such a usage, and we may doubt, as some of us do doubt, the reasonableness and therefore the legality of a usage, if it exists, which authorizes the dissolution of a pastoral relation, and terminates before the end of the year, and on the instant, the pastor's right to his salary without his consent, or any provision for his support or that of his family, until he can find employment and support in another field. But no question in relation to the illegality of the usage, on the ground that it was unreasonable, was made in the court below, and none is presented by the motion for our decision.

For these reasons a new trial must be denied.

In this opinion the other judges concurred.